UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------- x
ROBERT L. MAZZEO II,                                                     :
                                                                         :
                                    Plaintiff,                           :     **<u>COMPLAINT</u>**
                                                                         :
                        -against-                                        :     Civil Action No.
                                                                         :
                                                                         :     JURY TRIAL DEMANDED
ALLIANCE MMA, INC.                                                       :
                                                                         :
                                    Defendant.                           :
----------------------------------------------------------------------- x

      Plaintiff Robert L. Mazzeo II, by and through his attorneys, Zeisler PLLC, for his

complaint against defendant Alliance MMA, Inc. ("Alliance") alleges as follows:

<u>NATURE OF THE ACTION</u>

      1.     Bob Mazzeo was a senior partner at a profitable law firm when he represented

Alliance as corporate counsel in 2016 and 2017.  In January 2018, Joseph Gamberale, the

founder of Alliance and a member of its board of directors (the "Board"), asked Mazzeo to

serve as Alliance's Chief Executive Officer.  Although Mazzeo was not interested in taking

on that role, he eventually agreed after (1) Gamberale expressly told him that he had obtained

firm commitments for between $2.5 million and $3 million in new equity capital for the

company and (2) he and Gamberale agreed on the material terms of his employment as CEO,

including salary, equity compensation and a three-year employment term.  These terms were

later memorialized in a formal written employment agreement prepared by Mazzeo's

counsel, but never executed by Alliance.

      2.     After a short time as CEO, Mazzeo learned that Gamberale's representations

about Alliance's access to new equity capital were untrue, and that the company would be

required to raise significant amounts of capital immediately to remain in operation.  As

Mazzeo worked to identify numerous fund-raising possibilities for the Board's consideration,

from bridge loans to reverse merger transactions, the Board abruptly informed him that the company was "going in a different direction," that his services were no longer needed, and that they would allow him to resign rather than be terminated.

3.      In terminating Mazzeo's employment, Alliance refused to honor the terms of his employment agreement, including paying him the severance amounts owed to him over his three-year employment term.  In a further show of bad faith, the company refused to pay Mazzeo the compensation to which he was entitled for periods when he was employed, did not reimburse him for valid business expenses he incurred while acting as CEO, and similarly reneged on its obligation to provide Mazzeo with a written stock option agreement following the grant of options to him approved by the Board on March 9, 2018.

4.      Between Alliance's breach of contract and fraudulent inducement, Mazzeo has suffered damages in excess of $500,000.  Mazzeo accordingly brings this lawsuit for compensatory and punitive damages based on Alliance's intentional wrongful conduct.

## JURISDICTION AND VENUE

5.      This court has personal jurisdiction based on complete diversity of citizenship among the parties under 28 U.S. § 1332(a)(1).

6.      Plaintiff Mazzeo is a resident of the State of Florida.

7.      Defendant Alliance is a corporation organized under the laws of the State of Delaware with a principal place of business at 590 Madison Avenue, New York, New York.

8.      Plaintiff Mazzeo seeks damages greater than $500,000 (exclusive of punitive damages, attorneys' fees, costs, and prejudgment interest), which exceeds the jurisdictional amount under 28 U.S. § 1332(a).

9.      Pursuant to 28 U.S. § 1391(b)(1), venue is proper in this district because Alliance maintains its principal place of business in the Southern District of New York.

## THE PARTIES

10.    Plaintiff Mazzeo is the former Chief Executive Officer of Alliance.

11.    Defendant Alliance is a publicly-traded company in the business of promoting mixed martial arts ("MMA") events.

## FACTUAL ALLEGATIONS

**Alliance Launches Its Mixed Martial Arts Business**

12.    In 2014, Joseph Gamberale was the managing member of Ivy Equity Investors, LLC ("Ivy Equity"), a New York-based private investment firm.

13.    At that time, Gamberale, acting though Ivy Equity, began pursuing a roll-up transaction involving regional MMA businesses.

14.    In February 2015, Gamberale formed Alliance as the investment vehicle for the MMA roll-up, whereby various regional MMA production companies would operate under a single umbrella organization.

15.    In 2015 and 2016, Alliance negotiated deals to acquire MMA promotion companies on terms that were contingent on completion of the company's planned initial public offering of its common stock ("IPO").

16.    In November 2015, Alliance retained Mazzeo Song P.C. to handle the legal work associated with its proposed IPO.

17.    Plaintiff Mazzeo was a senior partner at Mazzeo Song P.C.

18.    After graduating from Yale Law School, Mazzeo had practiced corporate and securities law for more than thirty years at a number of law firms and investment banks in New York, including Sullivan & Cromwell, Lehman Brothers, Smith Barney and his own firm, Mazzeo Song, P.C.

19.    In October 2016, Alliance completed its IPO and its stock was accepted for

trading on the NASDAQ Stock Market, at which time Alliance commenced operations.

20.    Following the IPO, Mazzeo and his law firm continued to serve as Alliance's corporate counsel.

21.    From the formation of Alliance until Mazzeo's termination of employment, Gamberale was the largest beneficial owner of its common stock.

22.    In addition to his role as the founder of Alliance, Gamberale has been a member of the Board since inception, and has served as Chairman of the Board's Compensation Committee and as a member of the Board's Audit Committee and Nominating Committee.

**Alliance Seeks New Management After Sustaining Heavy Operating Losses**

23.    Alliance consistently incurred heavy operating losses following the IPO.

24.    In late 2017, Gamberale and other Board members began to consider changes to senior management in an effort to reverse Alliance's losses and the deterioration of its stock price.

25.    The management changes discussed by the Board were intended to facilitate the Board's desire to cut operating expenses, procure television and other media contracts, and improve the quality of event sites.

26.    On January 9, 2018, Alliance completed a public offering of its common stock that resulted in significant dilution to Alliance's stockholders and a drastic drop in its stock price.  Shortly following the offering, the Board decided to terminate its Chief Executive Officer, Paul Danner, along with its Chief Marketing Officer and its President.

27.    The Board undertook to identify individuals to replace management and decided on Ira Rainess to become the new CEO.  At the time, Rainess was employed as the company's Executive Vice President/Business Affairs.

4

28.     Upon information and belief, Gamberale met with Rainess for lunch in early 2018 to discuss the possibility of Rainess taking over as Chief Executive Officer of Alliance.

29.     On January 23, 2018, Gamberale and Mazzeo met Paul Danner for lunch at Max's Grill in Boca Raton for the purpose of informing Danner that his contract as CEO was not being renewed on May 1 and that a succession plan needed to be implemented.

30.     Prior to Danner's arrival at the meeting, Gamberale asked Mazzeo if he would take on the CEO position if Rainess declined the position.  Mazzeo said he would consider doing so only if he had an employment contract that made stepping away from his law practice worthwhile.  Gamberale assured him that a written employment agreement in the form typically given to management would be provided, and that the agreement would protect him if the company were sold or ceased operations.

31.     Mazzeo expressed concerns to Gamberale about becoming the CEO of a company that was running a risk of insolvency as it burned through cash at a rapid rate.  In response, Gamberale told Mazzeo that he had obtained firm commitments for another $2.5 million to $3 million in equity investments for Alliance.  Gamberale assured Mazzeo that these new investments, together with the cash Alliance had raised earlier in the month, would allow Alliance to fund operations through the fall while it sought to implement its revised business plan and pursued long-term financing.

32.     Mazzeo and Gamberale then discussed in greater detail Mazzeo's compensation package if he were to agree to become CEO.  By the end of the discussion, Gamberale offered terms to Mazzeo including a base salary of $180,000 per year, options to purchase 250,000 shares of Alliance common stock at current market, a term of three years, and incentive compensation with milestones to be determined.

33.     After Danner joined the meeting and Gamberale informed him that his

contract would not be renewed in May, the group discussed a succession plan involving first offering Rainess the CEO position, with Mazzeo to assume the CEO role if Rainess declined. Gamberale repeated to Mazzeo his assurance that Alliance would enter into a customary employment agreement with Mazzeo if Rainess were to turn down the CEO position.

34.     Upon information and belief, Danner flew to Baltimore on January 25, 2018 to offer Rainess the CEO position upon the expiration of Danner's term on May 1, 2018.

35.     On January 29, 2018, Gamberale met with Rainess, Mazzeo and Alliance's top production manager at Europa Café in Ft. Lauderdale to discuss the CEO situation. During that meeting, Rainess expressed to the group his reluctance to take the CEO position.

36.     When Gamberale asked Mazzeo whether he would take on the position with Rainess acting as President, Mazzeo tentatively agreed to do so subject, once again, to the conditions that (1) additional funding covering at least six to nine months of operations was available and (2) he would be granted a three-year employment agreement on the terms previously offered by Gamberale.

37.     Gamberale stated to the group that he had obtained firm commitments for $2.5 million to $3 million in equity capital which would carry the company until the fall of 2018. By that time, he stated, the cost-cutting and other Board initiatives would have taken effect, raising the stock price and culminating in either a public offering of stock or a strategic partnership or sale of the company.

38.     On or about February 1, 2018, Mazzeo told Gamberale that he would act as CEO on the terms discussed with Gamberale, including:  (i) an annual base salary of $180,000, (ii) the grant of an option to purchase 250,000 shares of common stock, and (iii) an employment term of three years (the "Employment Agreement").

39.     Gamberale assured Mazzeo that the Board would approve the Employment Agreement because Mazzeo's compensation would be at the same rate that he earned the prior year as counsel to company, and because the agreement mirrored the employment agreements executed by the Board for virtually every other senior management employee – which included a three-year employment term.

40.     Mazzeo would not have accepted the CEO position if he had not been assured that he would receive a written agreement memorializing the employment terms agreed with Gamberale.

41.     Gamberale's representations that funding had been secured were critical to Mazzeo's decision to accept the CEO position in light of Alliance's dire financial condition.

42.     Without the $2.5 million in extra capital that Gamberale claimed had been secured, Mazzeo did not believe that Alliance would be able to achieve either of the two major objectives outlined by the Board – entering into a strategic partnership with another sports media company or completing another public offering of stock.

43.     Mazzeo would not have accepted the CEO position if he had known that Alliance had not, in fact, obtained additional funding on the terms Gamberale represented.

44.     On February 5, 2018, Mazzeo resigned as a partner of Mazzeo Song P.C. so he could accept the CEO position at Alliance.

45.     On February 6, 2018, the Board held a meeting and formally approved the appointment of Mazzeo as CEO.

46.     On February 6, 2018, Alliance announced the hiring of Mazzeo as Chief Executive Officer.

47.     On the same date, Alliance also announced that Danner had resigned, and that the company had terminated its President and Chief Marketing Officer.

48.     Because of the significant management vacancies that existed, the Board asked Mazzeo to assume his role as CEO effective immediately.  In order to accommodate that request, Mazzeo agreed to act as CEO without a formal written agreement until one could be prepared.

49.      Mazzeo subsequently presented a written employment agreement (the "Formal Contract") for approval by the Board, which memorialized the material terms of the Employment Agreement, as follows:

     a. It stated that it was effective as of the first day of Mazzeo's employment as CEO, February 7, 2018.  Ex. A at 1.

     b. It had a three-year term.  Id. ¶4.

     c. It provided for an annual base salary of $180,000.  Id. ¶5(a).

     d. It provided for an award of 250,000 stock options.  Id. ¶5(c)(i).

     e. It stated that Mazzeo promptly would be reimbursed for his reasonable business expenses incurred in connection with performing his duties as CEO.  Id. ¶5(e).

     f. It specified that Mazzeo would be paid his base salary through the end of the three-year contract term if he was terminated without cause.  Id. ¶6(c).

50.     Throughout Mazzeo's employment at Alliance, Gamberale repeatedly assured Mazzeo that the Board would approve his employment agreement. Mazzeo relied on those assurances in acting as CEO, including when he certified the company's Annual Report on Form 10-K that was filed on April 16, 2018 and, again, when he certified the company's Quarterly Report on Form 10-Q that was filed on May 15, 2018.

51.     Gamberale similarly reiterated his prior assurances to Mazzeo that he had obtained firm commitments for at least $2.5 million in equity funding for Alliance.

52.     In the last week of February 2018,  for example, Mazzeo, Gamberale, and a close associate of Gamberale who represented individuals who had invested in Alliance had lunch at Café Frankie's in Boynton Beach, Florida.  Once Gamberale and Mazzeo were alone

8

following the lunch, Gamberale again said to Mazzeo that he had "locked up" at least $2.5 million to $3 million in additional investments.

**Mazzeo Learns that Gamberale's Funding Representations to Him Were False**
**Before Alliance Asks for Him to Resign and Reneges on the Employment Agreement**

53.    Consistent with the Board's wishes, Mazzeo commenced his employment as the Alliance CEO on February 7, 2018.

54.    At all times while he was employed as Chief Executive Officer, Mazzeo performed the duties required by his position.

55.    During Mazzeo's employment with Alliance, he was paid an annual base salary of $180,000, as Mazzeo and Gamberale agreed.

56.    In connection with his duties as CEO, Mazzeo incurred several thousand dollars in reasonable business expenses.  Following standard business practices, Mazzeo requested reimbursement of these expenses from Alliance.

57.    On March 9, 2018, the Board approved the grant of $250,000 in options to Mazzeo, consistent with the agreement between Mazzeo and Gamberale.

58.    During February and March, on the assumption that the company had raised enough working capital to achieve at least one of its stated business outcomes, Mazzeo worked to identify and implement cost reductions and organizational changes in an effort to streamline the operation and strengthen the core business.

59.    By April 2018, it became clear to Mazzeo that Gamberale's representations about having firm commitments for at least $2.5 million in equity investments were not true.

60.    Without additional funding, Alliance was forecast to run out of operating capital by the end of May. As a result, Mazzeo quickly turned his efforts to raising capital for the company.

61.    Mazzeo informed the Board at that time that a possible solution to the

company's unsustainable cash burn rate would be a "reverse merger" in which Alliance

would merge with an unaffiliated operating company that wished to become public. Mazzeo

explained to the Board that, while such a transaction would dilute the existing stockholders

substantially, the alternative was likely to be bankruptcy, which would be far more dilutive.

62.    During April and May, Mazzeo conducted dozens of calls with prospective

investors, and submitted a number of funding alternatives to the Board for its review.  These

fundings consisted of short-term debt financings that were intended to "bridge" the company

to a merger transaction.  At the same time, Mazzeo reviewed numerous reverse merger

possibilities, with the goal of finding a merger candidate that had both significant cash on

hand to keep the company alive through the process, and that operated a viable business that

potentially could create stockholder value over the long term.

63.    Rather than utilize any of the debt financings presented by Mazzeo, the Board

preferred to raise smaller amounts of capital "internally" while reviewing options to merge

Alliance.  Mazzeo had presented several reverse merger transactions to the Board, and, as

Mazzeo had suggested, the Board chose to pursue the best capitalized of the available

options, subject to conducting a due diligence investigation of the merger candidate.

64.    At the same time, however, the Board was pursuing a parallel path with

another reverse merger candidate, without involving Mazzeo in the process or even

informing him that negotiations with the other company were taking place.

65.    On May 20, 2018, following days of inaction by the Board on the funding

alternatives that the Board had authorized Mazzeo to negotiate and finalize, a member of the

Board informed Mazzeo of the parallel negotiations that had been taking place without

Mazzeo's involvement.

66.    On May 25, 2018, one of the Board members, Joel Tracy, abruptly called

Mazzeo to say that the company "was going in a different direction" and that "you are on the cut list." He said that the company would permit Mazzeo to resign rather than be terminated.

67.   In accordance with Tracy's direction, Mazzeo submitted his resignation to the Board on May 25, 2018.

68.   After Mazzeo was terminated, he asked for Alliance to honor its commitments in the Employment Agreement by providing him with the following:

    a.   Payment of his salary from the month of May;

    b.   Reimbursement of several thousand dollars in reasonably incurred business expenses;

    c.   Payment of severance amounts due under his three-year Employment Agreement; and

    d.   A written stock option agreement based on the grant of options to Mazzeo approved by the Board.

69.   In spite of its contractual commitments, Alliance has refused to make any additional payments to Mazzeo or to provide him with the required written stock option agreement.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

70.   Plaintiff repeats and re-alleges all of the allegations made in the prior paragraphs of this Complaint as if each paragraph was fully and completely articulated in this paragraph.

71.   Alliance, acting through Gamberale, and Mazzeo entered into a binding and enforceable Employment Agreement.

72.   The terms of the Employment Agreement were memorialized in the Formal Contract. See Exhibit A.

73.     Mazzeo performed all of his obligations under the Employment Agreement, beginning on February 7, 2018.

74.     Despite a demand by Mazzeo, Alliance has failed to comply with its obligations under the Employment Agreement.

75.     Based on Alliance's breach of the Employment Agreement, Mazzeo has suffered damages for which he should be compensated, including prejudgment interest from the date of Alliance's breach of contract.

## SECOND CAUSE OF ACTION
### (Fraudulent Inducement)

76.     Plaintiff repeats and re-alleges all of the allegations made in the prior paragraphs of this Complaint as if each paragraph was fully and completely articulated in this paragraph.

77.     To induce Mazzeo to take the CEO position, Gamberale told him that he had he had obtained firm commitments for between $2.5 million and $3 million in equity investments for the company.

78.     This representation by Gamberale was false, and Gamberale knew that it was false at the time that he made it.

79.     Mazzeo reasonably relied on Gamberale's false representation when he decided to leave his law practice and become the Alliance CEO.

80.     Gamberale's misrepresentation has caused Mazzeo to suffer damages.

81.     Based on Gamberale's intentional misconduct, Mazzeo is entitled to compensatory damages, punitive damages, and payment of his legal costs and expenses, including reasonable attorney's fees.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff Mazzeo respectfully requests judgment against defendant Alliance, as follows:

A.      Awarding damages in favor of Mazzeo and against Alliance in an amount to be proven at trial, including interest thereon;

B.      Awarding Mazzeo punitive damages, his reasonable costs and expenses incurred in this action, including legal fees and expenses; and

C.      Granting such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       December 14, 2018

Zeisler PLLC

By: _____

Brian A. Burns
Meghan H. Sullivan
800 Third Avenue, Suite 2800
New York, New York 10022
Tel. No.:  (212) 671-1921

Attorneys for Plaintiff Robert L. Mazzeo II